Good morning, Your Honors. My name is Duke Walquist, and I am here on behalf of the appellants, Mr. Richard McWilliam, and the Upper Deck Company. And just in listening to the preceding argument before the Court, there is a fundamental idea that I want to harp on, because I think it has equal application to this case, and I think it's where the arbitrators in the District Court went awry. And that is, an amorphous idea that somebody may have is not governing in this case some idea that there had to be a redemption at a fair market value in connection with this matter that somebody may have assumed somewhere. Well, it's not quite as broad as all that, because there's no question. And you certainly don't contest the fact that, I'm going to get the sections wrong, but 2, 3, and 5, whatever they were, in fact, are tethered. The redemption rights, the option put, are all tethered to fair market value. So that's really all in an arbitration context, unlike a direct appeal context, which we were talking about last time, is required, is that the arbitrator's decision be from the policy, be from the agreement. Well, I don't think it is from the agreement, Your Honor. I think you have to read Section 1 as well. And I think Sections 2 and Section 5 clearly address only specific circumstances and not the circumstances under which this redemption took place. I would really be helpful to me to just hear you verbalize why Section 1 is so important, because as I would read KPMG's opinion letters, for example, they don't single out a right to buy back shares. Freestanding in Section 1 is contrasted with the rights set out in 2, 3, and 5, or whichever they are. And the insurance is with respect to the tax strategy plan in those sections. No, Your Honor, the insurance is in connection with the risks that are set forth in the insuring agreement. And the reason the KPMG's opinion, which is captioned, I believe the relevant opinion is captioned, about the charitable contribution, addresses those two sections is because those are the only two sections that presented any issue in connection with the structure of this plan running afoul of the tax code. That's what needed to be analyzed. There's some rights that you would be giving some shareholder in connection with the shareholder's agreement that some other shareholder didn't have. And that was the fundamental issue. And I might add, in connection with the reading of the policy and the opinions in that regard, the district court's opinion itself specifically found there was no provision of the policy. None. Zero. Which required that any redemption be at fair market value. It says any redemption. I'm using those words. It says any redemption in the same sentence where it talks about a redemption under Section 5, which is the PUT agreement. And to take a sentence which addresses a redemption under the PUT agreement in the first clause of the sentence and then in the second clause of the sentence and says so any redemption has to be at fair market value and say that means any redemption in any circumstance has to be at fair market value, I think really does violence to the language. And I think even the district court recognized that. Where I think the district court went awry or went wrong is it found some understanding, some idea on some of it. More accurately, it concluded that the arbitrators could find implicit in all of the papers an understanding that the insurance, what was being insured, the risk that was being insured against contemplated fair market value transactions. And the operative word in your statement, Your Honor, is implicit. And if I may, the words of the representation letter are facts, assumptions of fact, and understandings of fact set forth in the opinions of KPMG attached as Exhibit A to the policy. Well, it's not set forth in them. I mean, it is set forth and you can read them. Can't you read the package and fairly say, look, this whole thing, contemplated transactions at fair market value, otherwise we're jeopardizing even the 70% whatever shot at success before the IRS, which will, if they're not at fair market value, probably conclude that you've created two classes of stock. Well, the district court couldn't and didn't. What the district court said was it doesn't appear anywhere in the policy, but it found it was somehow implicit in the transaction. It's not a text-based analysis. They're finding that somehow there is an idea, to use your own honors expression in the prior argument, some idea that is more important than the text of this policy and the text of the representation letter that was given by the insured. Can I switch to a slightly different subject? Yes, Your Honor. Mr. McWilliam apparently did not file or claim a charitable deduction on his 2001 tax return. Do you disagree that that was a failure to comply with Section 9B? Absolutely, Your Honor. Why is that? Because if you read the opinion that addresses the analysis of the charitable contribution, it doesn't say Mr. McWilliam must take a deduction. It says Mr. McWilliam will be entitled to a deduction. Moreover, though, his entitlement to that deduction will have severe limitations on it that are based on his other charitable contributions in connection with the year and his adjusted gross income, and it may therefore be delayed. And the law is also absolutely clear. He didn't need to claim it on his first in 2001, okay, if those provisions might apply. He could wait and claim it in a later year, or he could even amend his return in a later year in that regard. And I might also add that the analysis of those of the charitable contribution and the entitlement to the charitable deduction appears an entirely separate opinion from KPMG than the opinion that addresses the allocation of the income, and it's there where the true loss occurred. There wasn't a loss here that resulted from the deduction. I think the second opinion was not covered by the insurance policy at all. No, it's absolutely covered, but if I might, there are two things you need to keep in mind in connection with it. The policy itself, Section 9b, says that if you fail to comply, and I think we complied. I think it's consistent. That's my first argument. The second argument is, you know what, if it's not consistent, express written terms of the policy in New York law, so what? Because Section 9b says it only matters if it's a prejudice to the insurance company. And my point in connection with respect to the separate analysis in those two opinions is the charitable deduction has nothing to do with the allocation of income, which is where the entire loss occurred. And that's relevant under both Clause B of the policy and Section 3106 of the New York Insurance Code. So could I ask you two questions? First, A, what happens if the arbitrator simply misconstrued that section of the agreement, which I tend to agree with you on? Does that mean you win? I mean, so they misconstrued it. That's the problem. You know, that's what chances you take when you go into arbitration. We're not reviewing De Novo, a decision of a court below. You have directed me to the scope of review of the arbitrator's opinion. Let me address that briefly. I don't know if I'm running out of time yet or not. You've got five and a half minutes. Okay. The statute clearly contemplates that you can vacate an award, and a court should vacate an award, if the arbitrators exceeded their powers. But they have the power to construe the contract. And then what you're arguing, and on this one I think there's some force to your argument, is that they misconstrued the contract. And so they misconstrued the contract. So what? I mean, don't you have to show something more than that? As long as they're, it seems to me, the rule is as long as they're applying the terms of the contract. If they make a mistake, they make a mistake. Well, let me address that because I think there's a second line of cases in this circuit that actually addresses that language and speaks to manifest disregard of the law. Okay. And, you know, we've cited that line of cases. Under the provision speaking to exceeding the arbitrator's powers, there is a line of cases that says when the arbitrators manifestly disregard the law, their award can be vacated. Now, it's absolutely clear. Where do you draw the line between simply making an error and construing the contract? You know what, Your Honor? And manifest disregard of the law. As I was preparing for this hearing last night, I read a standard practice manual in that regard that summarized all the cases and came to the same conclusion I did. There is a fundamental tension between honoring the party's intent in connection with a contractual arbitration clause that says you will arbitrate this dispute pursuant to the law in front of the arbitrators and vacating an award that isn't rooted in the law and in the contract because surely that's all the party's agreed to. And if it's not rooted there, it does exceed their powers. There's a tension between that and wholesale judicial review for legal error. I will grant you that. But this circuit does have a law, a narrow provision to be sure, that says when you manifestly disregard the law, we have to show we presented that issue, that argument, and the law to the arbitrators. And we did. And they don't address it. Counsel, didn't the Supreme Court this year in Wall Street Associates expressly pass doubt on that manifest disregard of the law concept? Well, I think what the court did is it said certainly you cannot have a basis for review of the award that is not statutorily based. That much I will agree with you on. As I read this circuit's prior law, and I guess for the three of you to decide, but as I read it, that manifest disregard of the law standard does come under and was decided under the rubric of that provision of the FAA, that the arbitrators exceeded their powers when they manifestly disregarded the law. But under current Supreme Court law, aren't we really in a situation, as Judge Foreman suggested, that even if you're right that the arbitration panel probably misconstrued some elements of the contract, they were at least trying to apply the contract, presumably acting in good faith, if they missed it, what right do we have to gainsay that arbitrator panel decision? Well, you have the right to gainsay it when they manifestly disregard the law. I thought the Supreme Court disagreed with that concept. Well, you and I may respectfully disagree. I think if you go back and look at this circuit's cases that We're talking about the Supreme Court here. Yeah, but this circuit decided those under the explicit provisions of the FAA. And what the Supreme Court has said, you can't go beyond the FAA. They haven't said that the manifest disregard of the law. That's not the way I read it. It's to say manifest disregard of the law doesn't come under any circumstance under the FAA's provision for the arbitrators exceeding their powers. Surely if they manifestly disregard the law, that's not what the parties bargained for. That's not what they agreed to. And if you look at the face of their award, there are two sentences addressing this argument. But, counsel, because you're almost out of time, I just want to make this point. It sounds to me like your reading of manifest disregard of the law is, in effect, equivalent to what we would have in a normal review of a decision by a lower court where basically we can review their finding of the facts of the law and so on. And if they get it wrong, then they have, in quotes, manifestly disregarded the law. Isn't the Supreme Court's clear instruction to this circuit and every other circuit that arbitrators and arbitration is very favored and the courts will not get involved unless there's just a real outrage where they are so far from the contract, so far out of bounds that nobody could possibly get there? Well, I think what the Supreme Court has said is you can't exceed the bounds provided by the statute. And is your characterization so out there? I think that when the law of waiver, for example, in connection with Clause 9b, that it wasn't raised when AIG denied the claim, that law is explicitly brought to their attention. The only evidence in the record is that AIG knew that that deduction had not been taken long before they disclaimed the coverage. And that the New York law that says that coverage defense is waived under those circumstances, it was clearly brought to the arbitrator's attention and they disregarded it. And in that regard, this is a tougher standard than just they got it wrong on the law. Okay. And I recognize it's narrower than just they got it wrong on the law. I understand that I'm fighting a tough battle in terms of the scope of review that is granted here, but I really do believe we come within the scope of that exception, that statutory exception. Okay. I'm sorry if you don't have a clock. You're over by about a minute and a half. And I apologize for that. Okay. Just a quick question. Sure. Judge Corman has a question for you, though. Suppose, let's assume we should agree with you on the charitable deduction, but we disagree with your earlier argument on the repurchase at fair market value. You still lose, don't you? I hate to admit it, but, yes, Your Honor, I would still lose. Anything else? Okay.  Mr. Strohle. Hi, Your Honor. I'm Peter Strohle on behalf of the Claimant Insurance Company. After eight days of hearings and 11 witnesses and three rounds of briefing, the panel of three neutral, experienced arbitrators found that this case can be reduced to two simple truths. The first one is that the policy ensured a specific, discrete transaction set forth in documents, annexed to and made part of the policy, which had two key components. One is that there be a charitable gift so that the charity has to be a true owner of the stock, entitled to the benefits and burdens of ownership, including any increase in the value of the stock, and also that the charity have the right to put the stock back to the company for fair market value, pursuant to an independent appraisal. The second simple truth is that in December of 2002, when Upper Deck was experiencing a tremendous surge of income due to the game Yu-Gi-Oh!, which is very popular with children, they decided to exit the insured transaction without telling their insurer for a $2 million take it or leave it offer that was less than one-fifth of the fair market value of those shares. In a December 9th letter, they told the fund that if you annualize the income of the company, it's going to be $39 million. When they knew at the time, in October alone, the income of Upper Deck exceeded $39 million, and for the year it totaled over $150 million, and they told the fund that, by the way, if you don't comply with this, you may get nothing. As a result, Mr. McWilliam was able to take a $75 million charitable deduction, not distribution, I'm sorry, without having to share any of it, let alone 90% of it with the charity. Now, the panel found no coverage on four separate grounds. The first ground, which wasn't touched on in the prior argument by Mr. Walquist,  And that it naturally follows from the two simple truths in that, as the chairman of the panel, Mr. Burns, said on the second-to-last day of the hearing, the definition of insured tax loss is clear and direct. What it means is that to recover under the policy, you have to follow the tax plan. And this tax plan followed a KPMG deal. They didn't do the deal. They exited the deal. Therefore, there's no coverage. It's that simple. And there's three New York cases that I cited, which all have this simplistic logic, and that is Sedco and Portofino and Zappone. Basically, what it means is when you have a laser-shot type of policy as this is, and it's geared to a specific item, such as, for example, and I think it was Zappone, a specific car, and the car is described in the contract. And then you have an accident in a totally different car. There's no coverage because you haven't done the insured transaction. As a practical matter, insurance companies underwrite to a specific set of facts, don't they? Correct. And in this case, the set of facts were those set forth in the KPMG opinion. That's correct. In this case, I guess, opinions. There were a couple of them, I guess. And also a shareholder's agreement, and there's also an appraisal attached to the policy. The bottom line is if their conduct varied from the terms that were insured, in terms of what was underwritten, then your point is that an arbitrator looking at those facts could rather easily, without manifestly disregarding the law, reach the conclusion that the policy did not cover the transaction. And I think that's exactly what you did, what the arbitrators did. And if you focus on the last two days of the hearing, that's really where they focused, is that regardless of fair market value, you didn't do the insured transaction. And that's made clear in the share purchase agreement that Mr. McWilliams signed without telling the insurance company. Section 5.3 terminates the shareholder agreement, which was made part of the policy. It's that simple. Getting to the other points, and I could take them in any order you want, breach of warranty was the focus of the district court, primarily. And breach of warranty, when you get down to it, it comes to whether the panel's conclusion was based on whimsy or bias. And as arbitrator Moxley, a distinguished professor at Fordham Law, made clear, their decision on that ground was based on a natural reading of the policy as to why the transaction will work. And that really should end your inquiry, because he's saying there, we're basing it on our interpretation of the policy. As this court has held in Hawaii Teamsters and Barnes, and even more recently in Keosara, as long as the panel is interpreting the contract, whether they did so correctly or not is not for a court to decide. And as the Supreme Court said in Hall Street recently, vacating an arbitration award is a very limited review process. You only review it, the type of review necessary to resolve the dispute straightaway. You look to see if due process was done. You don't go into the substitute merits of the case. You shouldn't have to do that. That's the whole purpose of arbitration being a fast-moving process, without the lengthy court interpretation and back and forth. With respect to their interpretation of the policy, it's very narrow. And as the district court said, it's inconsistent with the rest of the policy. That every time you see redemption in the KPMG opinion on charitable contribution, that means Section 5, since it's only talking about Section 5. It's not talking about what we did in December 2002. That ignores the whole purpose of the opinion. The purpose of the three opinions was to give a justification as to how under the second class of stock this transaction had a 70% chance of winning and how on the other issues, such as economic substance, it had a 50% chance of winning. And one area where I kind of depart from the district court is that the award doesn't say that this breach of warranty, that you have to have fair market value at both the beginning and end of the transaction, was just based on the second class of stock. The economic substance doctrine is equally important because the whole purpose of this thing is to show that you had a charitable donation and that this fund had the right to the benefit of any increase in the value of the stock. Otherwise, it looks like you're just parking the stock. And that's why on page 2 of the KPMG opinion on charitable contribution, Mr. McWilliam warranted that he had a desire to support the fund. He had donated intent. But getting to that specific round of the second class of stock, on page 6 of that same opinion, it says any buy-sell agreement in order to satisfy the second class of stock has to provide for fair market value. I think they used the phrase can't be substantially more or less than fair market value. Any buy-sell agreement. And as Linda Burke, who was in charge of the very IRS office that looked at these things, testified, this December 2002 agreement was a buy-sell agreement. And it created a very large concern that you're going to run afoul of the second class of stock. Going to the charitable deduction issue, New York law is clear, and I think Judge Corman would testify to this, in Oppenheimer, that in order to satisfy a condition precedent, it has to be literal compliance. Substantial compliance is not enough. Section 9B said it's a condition precedent to this policy that you file your tax returns in a manner that's materially consistent with the KPMG opinions. Now, the panel concluded that by failing to take that deduction, by saying in his voluntary disclosure statement to the IRS, the agreement provides that I actually said I will take this deduction. And then 11 months later, he's not taking the deduction. What's up about that? And I think you could look at it. And I actually did find a case last night that says you can't even waive a condition precedent. And that's the SANA versus Nationwide insurance case cited in our brief. Because when you get down to it, a condition precedent is whether there's coverage or not. You can't waive an argument there's no coverage. But doesn't the contract itself say that any failure by the named insurer to comply with this clause, clause 9, which deals with the deduction, will not relieve the insurer of any obligation, any of its obligations under this policy, except to the extent that the failure to self-comply adversely affects the insurer? That's in Section 9A. It says that, not 9B. And I think the panel could have. It says with this clause 9, which implies it's the entire clause. I think the panel could have looked at that and said since it's in Section 9A, it doesn't apply to 9B. I agree you have an argument. But when it's arbitration, all you have to do is interpret it. And I think that the failure to take a charitable deduction, as Judge Gonzalez alternatively held, is also a question of you've got to provide, you have to show that the insurer had intentional relinquishment of a known right. And that includes knowing the circumstances in which the failure to take the deduction. And here they withheld the documents showing that the tax returns, the failure to take the deduction, were in the context of totally depriving the fund of any due process in a transaction, which was a total abandonment of what you insured. All they did was point to a mass of documents two, two and a half years later and say, look at this, and you decide for yourself. Well, that's not providing the insurer with the knowledge necessary for waiver, even if waiver could apply. From your client's perspective, is there anything that the arbitration panel did that would come even close to manifestly disregarding the law? The only argument that's made by Upterbeck, as far as I can tell on that issue, is a charitable deduction that they have somehow shown to the panel that there was waiver. But they didn't do that. If you look at every site they have for that, it's a footnote in a brief or a one liner, a conclusory assertion that wherever you, in a denial of coverage letter, don't include a particular reason for no coverage, it's waived. But they failed to go a little bit further and say, well, you also have to show that you provided knowledge, full knowledge of all the circumstances relevant to that. And here they did not do so. What impact, if any, did Hall Street Associates have on that manifest disregard of the law standard? Well, what the court said on that, in Judge Souter's opinion, what he said was they were trying to argue in that case, the loser was trying to argue that somehow because manifest disregard in the Wilco case was mentioned as sort of a way around this very strict scrutiny, this approach where it's very hard to vacate an award and that you have some sort of general review. And the court said, no, that's not the case. Manifest disregard is not somehow a way around the standards, the strict standards for vacating an arbitration award. Well, it didn't, from your perspective, it did not do away with it, but just simply explained that this is not a review of a district court opinion unless there is something truly outrageous, I believe my terminology for it, that we're not going there. And in fact, as Judge Corman indicated, that as long as the panel looked at the contract, attempted to construe the contract, whether or not they got it technically right, the parties are still bound by the arbitration award. Yeah, I think that's correct. With respect to manifest disregard of the law, I think with respect to this particular circuit, they said that some court, including this court, has looked at it as a shorthand for Section 4. In other words, it's equivalent to exceeding your power. In order to exceed your powers on manifest disregard of the law, you have to basically go totally outside the realm of what is a reasonable legal argument, and that that simply was not done here. There's no more questions? Yes, I think not. Thank you. It's always helpful and, indeed, a privilege to have very informed and helpful arguments, and we did from both of you, so thank you very much. Thank you for your time. The matter just argued to be submitted and the court will adjourn. All rise.
judges: Rymer, Smith, Korman